(No. 46358.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. LOUIS EARL VISER *et al.*, Appellants.

*Opinion filed September 26, 1975.*

Ralph Ruebner, Deputy Defender, Office of the State Appellate Defender, of Elgin (Adam M. Lutynski, First Assistant Defender, and Peter B. Nolte (law student), of counsel), for appellants.

William J. Scott, Attorney General, of Springfield (James B. Zagel, Jayne A. Carr, and George C. Sorensen, Assistant Attorneys General, of Chicago, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

The defendants, Louis Viser, Sellie Viser, Lloyd Viser, Jim Brown, Carl Neal, Willie Freeman, and Harvey Smith, were indicted for the murder of Hector Jordan and the attempted murder of Harold Smith. The jury found Brown, Neal and Smith not guilty. Louis Viser, Sellie Viser, Lloyd Viser and Willie Freeman were found guilty of murder and attempt murder, and were sentenced to consecutive terms of imprisonment of not less than 199 nor more than 200 years for murder and of not less than 10 nor more than 20 years for attempt murder. The case is here upon the direct appeal of the convicted defendants, pursuant to former Rule 603.

The evidence presented at the trial was extensive and often contradictory. In addition to the testimony of the defendants and their companions, and that of Harold Smith and his wife, there was the testimony of seven independent eyewitnesses who were in the area at the time.

On September 19, 1970, a party was held at the home of Mrs. Berta Maley, at 727 Spring Street in Aurora, Illinois, to celebrate the promotion and transfer of her brother, Hector Jordan, to the Madrid, Spain, office of the Bureau of Narcotics and Dangerous Drugs. Among those in attendance were Harold Smith and his wife, Emily. Smith was a police officer in Anderson, Indiana, and had formerly been Hector Jordan's partner when both men were special agents with the Treasury Department. Shortly after 2 a.m. on September 20, 1970, Smith and his wife left the party. Hector Jordan accompanied them to their car, parked on the north curb, facing west, about 30 yards east of the Maley house. Both Smith and Jordan were carrying sidearms, as they usually did. Mrs. Smith got into the car and the two men remained talking near the open door on the driver's side. Some other friends who were leaving the party pulled alongside in their car, also facing west. After conversing for a few minutes with Smith and Jordan, they left.

Shortly thereafter, a black Ford headed east stopped sharply a few yards from the rear of the Smith car. The rear door on the driver's side of the Ford was partially open and Sellie Viser's legs were dangling out as though he was getting out of the car. The driver of the car, Jim Brown, jumped out and tried to prevent Viser from getting out, yelling, "You crazy sonofabitch, get back in there." Harold Smith and his wife testified that they then heard a voice inside the car say, "We'll teach those motherfuckers to block the road."

Brown testified that the defendants had been together at a local tavern and were on their way to another party,

their route taking them down Spring Street. The defendants Sellie Viser, Carl Neal, and Harvey Smith, as well as their female companions, Dora Hadley and Jewel West, were in Brown's Ford. The other co-defendants followed in a black Corvair driven by Nancy Wisely. The occupants of the Ford testified that, on the way to the second party, Jewel West told Sellie Viser that she didn't want to go and that she had enough money for cab fare. Sellie Viser jokingly replied that, if that was so, he'd let her out right there so she could catch one, and with that he told Brown to stop and opened the rear door of the moving car as if to get out. Brown testified that this caused him to come to an immediate stop. He got out to close Viser's door, which was broken and had to be lifted slightly from the outside before it would shut. According to the occupants of Brown's car, while he was trying to do this and was yelling at Viser to get back into the car, Smith and Jordan came over with drawn guns and, without identifying themselves as police officers, asked what was going on. Brown testified that he told them to go away and that nothing was going on. Brown and two other occupants of the car testified that Smith said something to the effect that "We'll kill all you niggers." Smith and Jordan walked back to Smith's car and holstered their weapons. Some of the occupants of Brown's car testified that they left the car and ran for safety when Smith and Jordan came up with drawn guns.

As Smith and Jordan were returning to Smith's car, the other co-defendants drove up in Nancy Wisely's black Corvair and stopped immediately behind Brown's car, with the rear bumper of their car approximately even with that of the Smith car. Louis Viser, Lloyd Viser, and Willie Freeman, with their female companions Toni Donaldson and Sandra Foster, were in the Corvair. Louis Viser walked up to where Brown was and asked what was happening. Sellie Viser, still sitting in the car, replied that Smith and Jordan had "pulled guns on us for no reason." Louis Viser

then started to walk over to Smith and Jordan. He was stopped by Brown, but he yelled at Smith and Jordan, "Don't ever pull a gun on my brother again." Willie Freeman testified that, when he got out of the Corvair, he walked over to Smith and Jordan and asked them what was wrong, and that Smith told him that he had better talk to his companions. Freeman testified that he then asked Smith and Jordan whether the matter couldn't be settled without the need for guns, and Smith and Jordan turned to leave. At this point Louis Viser yelled his warning at Smith and Jordan, causing Smith to reach for his gun again. Freeman testified that he lunged at Smith's gun hand to prevent him from drawing his weapon, and a scuffle ensued.

Smith testified that he and Hector Jordan remained at his car when Brown's Ford stopped nearby, but drew their weapons and identified themselves as police officers after approximately 6 to 10 people got out of the car, and 5 to 7 males started toward them. According to Smith, this caused the crowd to return to the Ford about the time Nancy Wisely's black Corvair drove up. Smith testified that one of the occupants of the Ford told one of the newcomers that guns had been pulled on them for no reason, at which time a newcomer yelled at Smith and Jordan that they couldn't do that to "a brother." A fight broke out at the rear of the Ford as the newcomer was restrained. Smith testified that, in his opinion, the man appeared to be drunk or high on drugs. According to Smith, Willie Freeman then came up to him and asked, "Man, what's going on?" to which Smith replied, "Man I'm a police officer. If you guys don't want to go to jail, get your people out of here." Freeman allegedly responded to this with, "You're a police officer. You got a gun. I want it." When Smith replied, "Ain't no way, Baby," Freeman allegedly said, "Then I'll take the sonofabitch," and lunged for the gun. Smith testified he pushed the gun down in the holster to keep it from Freeman, and about

three men began to punch him. His feet were pulled out from under him and he fell to the ground, still being wrestled for the weapon. Smith testified that, during this time, he kept repeating to the men that he was a police officer. Willie Freeman later admitted that he knew this fact. According to Smith, Freeman kept saying that there weren't any "white motherfucking cops" going to pull guns on them and get away with it, since this was "their territory." Lloyd Viser, Harvey Smith, and Jim Brown participated in this fight, together with Willie Freeman. As the fight went on Louis Viser ran back to the Ford to get a bumper jack. He was apparently joined by Sellie Viser, who got a tire tool, but it was not clear from the evidence whether either man actually used these instruments in the fight.

When the fight between Harold Smith and Willie Freeman began, Hector Jordan was standing on the passenger's side of the Smith car. He drew his weapon and, resting it on the roof of the car, told Freeman and his friends to "back off." Louis Viser then came up behind Jordan and began wrestling for his gun. He was joined by Sellie Viser, who claimed he punched Jordan in the head and then took his gun from him. As soon as Sellie Viser had Jordan's gun, he pointed it at the ground and fired five shots.

At about this time Harold Smith's gun was pulled out of its holster and discharged, nicking Jim Brown in the little finger. Smith testified he was hit with a pipe and lost control of his weapon. As he felt it go, he yelled to Jordan, "They've got my gun, Hector. Shoot them."

At this point, both white men were disarmed and down on the ground. Independent eyewitnesses testified that the attackers nevertheless continued to kick and beat the motionless forms of Smith and Jordan. Words to the effect of "Kill them. Finish them." were shouted by members of the group on several occasions. Finally, one of them yelled that the police were coming, and the group

fled. Before they left, however, Lloyd Viser went over to the motionless form of Hector Jordan and jumped on his chest twice, each time landing with both feet. As he ran away, he was heard to say, "I got that motherfucker good." Meanwhile, Sellie Viser ran up to where two eyewitnesses were standing, threatened them with Jordan's gun, and told them they had better get inside if they didn't want to get shot.

At the trial, the State proved that Hector Jordan's blood type was A-1, Harold Smith's was A-2, and that all the defendants had blood type O except Carl Neal, who had type B. The State showed that Lloyd Viser had blood of type A-1 on his shirt and chest and of type A-2 on his shoe. Willie Freeman was shown to have blood stains of type A-1 on his undershirt. The State also offered expert testimony that Hector Jordan died two weeks later of pancreatitis caused by severe abdominal injuries he received in the incident.

On appeal, the defendants raise these issues: (1) the trial court lacked jurisdiction to try the defendants because the indictment failed to charge the offenses of murder and attempt murder properly; (2) the evidence failed to prove each convicted defendant guilty beyond a reasonable doubt; (3) the representation of the defendants was incompetent and deprived them of due process of law; (4) the court committed prejudicial error in its instructions to the jury; (5) the prosecutor's statements in his closing argument misinstructed the jury and denied the defendants a fair trial; and (6) the sentences are excessive and should be reduced and made concurrent instead of consecutive.

The first contention of the defendants is that the court lacked jurisdiction to try them because "the indictment fails to properly charge the offenses of murder and attempt murder." We consider first those counts that charge murder. All of them are identical, with the exception that count I charges all of the defendants with murder, and each of the other counts charges a single

named defendant with murder and charges the other defendants as accessories. The following portion of count I illustrates the basis of the defendants' contention. It charges that the defendants committed murder in that they:

> "*** unlawfully, feloniously and without lawful justification, killed another individual, to-wit: HECTOR JORDAN, by inflicting upon him or causing to be inflicted upon him injuries which caused his death on the 14th day of October, 1970, by striking and beating him, both before and after felling him to the ground, the same being then and there done with their fists, and/or feet, and/or an instrument or instruments unknown to the Grand Jury, and when in the performance of said acts which caused the death of said HECTOR JORDAN they, (1) either intended to kill or do great bodily harm to the said HECTOR JORDAN, or knew that their said acts would cause death to said HECTOR JORDAN, or (2) they knew that their said acts created a strong probability of death or great bodily harm to said HECTOR JORDAN, or (3) they were attempting to commit or were committing a forcible felony upon said HECTOR JORDAN, to-wit, Aggravated Battery in violation of the Illinois Criminal Code of 1961, as amended, Section 12–4(a), in that they, in committing a battery, intentionally or knowingly caused great bodily harm to said HECTOR JORDAN; all of the aforesaid occurring in the City of Aurora, County of Kane, State of Illinois."

It is the position of the defendants that "aggravated battery, as an included offense of murder, cannot be the underlying felony in a felony murder charge where the aggravated battery is alleged to have been committed against the person who eventually dies." The issue presented is decribed as one of first impression in Illinois, and the defendants' argument is based upon decisions rendered under statutes which differ from those of Illinois.

Our statute defines murder as follows:

> "(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

> (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>
> (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or
>
> (3) He is attempting or committing a forcible felony other than voluntary manslaughter." Ill. Rev. Stat. 1973, ch. 38, par. 9—1(a).

Forcible felony is defined as follows:

> " 'Forcible felony' means treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, *aggravated battery* and any other felony which involves the use or threat of physical force or violence against any individual." (Emphasis supplied.) Ill. Rev. Stat. 1973, ch. 38, par. 2—8.

The defendants concede that the indictment in this case would have been valid if it had charged that they killed Hector Jordan while committing an aggravated battery upon Harold Smith. They say: "Although the prosecutor *could* have charged properly, he didn't, \*\*\*. \*\*\* The indictment did not charge that Hector Jordan's death was the result of the commission of a forcible felony upon Harold Smith, nor was the jury instructed that in order to bring the felony-murder rule into operation they would have to find that Jordan's death was the result of the commission of an aggravated battery upon Harold Smith."

At common law an unlawful killing which occurred in the commission of *any* felony was murder. Among the 50 States, the pattern of legislation concerning felony murder is extremely diverse. The Model Penal Code, section 201.2 (Tent. Draft No. 9, 1959), would alter the common law rule to provide that the offense of felony murder is limited to a murder which takes place in the commission of specifically enumerated felonies, not just *any* felony. Our Criminal Code limits the offense underlying a felony murder to "a forcible felony other than voluntary man-

slaughter," and, as has been noted, aggravated battery is a forcible felony. Ill. Rev. Stat. 1973, ch. 38, par. 9—1(a)(3); see Committee Comments to the section: Ill. Ann. Stat. ch. 38, sec. 9—1 (Smith-Hurd 1972).

The doctrine relied upon by the defendants appears to have been thought necessary in some jurisdictions in which the offense of murder is divided into degrees:

> "As previously shown, at common law, homicide resulting from an assault committed with intent to inflict serious bodily harm was classified as murder. Consequently there was no confusion between degrees of murder if the same act were punishable as felony-murder as well. But with the advent of the codified degrees of homicide it became necessary to devise methods of preserving the distinctions between those degrees." Note, *The Doctrine of Merger in Felony-Murder and Misdemeanor-Manslaughter*, 35 St. John's L. Rev. 109, 117 (1960).

So it has been held that an assault upon the person killed cannot be made the basis of a felony murder charge. *People v. Moran* (1927), 246 N.Y. 100, 158 N.E. 35; *People v. Ireland* (1969), 70 Cal. 2d 522, 450 P.2d 580, 75 Cal. Rptr. 188; see cases collected: Annot., 40 A.L.R.3d 1341 (1971).

Most felony murders, if not all of them, involve an aggravated battery, or, as in the cases referred to, an assault. That characteristic is not eliminated by the presence of an intention to commit another felony in addition to the aggravated battery or assault. This is recognized in the jurisdictions upon which the defendants rely. See *People v. Burton* (1971), 6 Cal. 3d 375, 491 P.2d 793, 99 Cal. Rptr. 1.

The defendants do not attack the constitutionality of the legislative definition of the offense of felony murder. Their argument seems rather to be based in part upon a theory of merger, designed, as has been indicated, to

support or accommodate a classification of degrees of murder, and in part upon assumptions about the particular kind of criminal conduct that the offense of felony murder was intended to deter. Our Criminal Code does not establish degrees of murder. And we are not concerned with whether the General Assembly, in establishing the offense of felony murder, intended to deter the criminal from the commission of rape, or robbery, or burglary, but not to deter him from the violent assault that accompanies each of those offenses. That kind of fragmentation of legislative purpose cannot survive the forthright characterization of aggravated battery as one of the forcible felonies that will trigger a charge of felony murder. What was intended was to deter the commission of any of the enumerated forcible felonies, including aggravated battery, by holding the perpetrator responsible for murder if death results. We hold, therefore, that the indictment did not improperly charge the offense of murder.

The defendants also argue that both the murder indictment and the instructions to the jury as to the offense of murder are erroneous because they are couched in the alternative. To support this contention they rely upon *People v. Heard* (1970), 47 Ill.2d 501. In that case the complaint charged the offense of gambling in the language of the statute, which named in the disjunctive a number of "disparate and alternative" acts, any one of which would constitute gambling. It was held that the complaint was void because it lacked the necessary certainty to charge an offense. The distinction between the *Heard* case and this one is that which was drawn in *People v. Smith* (1973), 15 Ill. App. 3d 61. All of the alternatives in the present murder indictment deal with a single act—the killing of Hector Jordan—and the alternatives describe differing states of mind or other conditions relating to that single act.

Substantially the same objections are raised with respect to those counts of the indictment that charge the

defendants with the attempt murder of Harold Smith. Those counts charge that the defendants (and in separate counts each individual defendant)

> "*** Committed the offense of Attempt *** in that they *** with the intent to commit Murder, in violation of said Illinois Criminal Code, Section 9—1, unlawfully, feloniously and without lawful justification, struck and beat another individual, to-wit: HAROLD SMITH, both before and after felling him to the ground, the same being then and there done with their fists, and/or feet, and/or an instrument or instruments unknown to the Grand Jury, and when in the performance of said acts (1) with either the intent to kill or do great bodily harm to said HAROLD SMITH or when they knew that their acts would cause death to said HAROLD SMITH, or (2) when they knew that their said acts created a strong probability of death or great bodily harm to said HAROLD SMITH, or (3) when they were attempting to commit or committing a forcible felony upon said HAROLD SMITH, to-wit, Aggravated Battery, in violation of the Illinois Criminal Code of 1961, as amended, Section 12—4(a), in that they, in committing a battery, intentionally or knowingly caused great bodily harm to said HAROLD SMITH, and all of which said acts constituted a substantial step toward the commission of Murder; all of the aforesaid occurring in the City of Aurora, County of Kane, State of Illinois."

The third alternative in these counts of the indictment was erroneously included in a charge of attempted murder. There can be no felony murder where there has been no death, and the felony murder ingredient of the offense of murder cannot be made the basis of an indictment charging attempt murder. Moreover, the offense of attempt requires "an intent to commit a specific offense" (Ill. Rev. Stat. 1973, ch. 38, par. 8—1), while the distinctive characteristic of felony murder is that it does not involve an intention to kill. There is no such criminal offense as an attempt to achieve an unintended result. The State meets this contention with the assertion that the third alternative is surplusage, and since it is phrased in the disjunctive it may be disregarded. We do not pass upon this

issue because we are of the opinion that the instructions to the jury concerning the offense of attempt murder were fatally defective. Those instructions stated:

> "People's No. 19. To sustain the charge of attempt, the State must prove the following propositions:
>
> First: That the defendant performed an act which constituted a substantial step toward the commission of the crime of murder; and
>
> Second: That the defendant did so with intent to commit the crime of murder.
>
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
>
> If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.
>
> People's No. 20. A person commits the crime of murder who kills an individual if, in performing the acts which cause the death,
>
> he intends to kill or do great bodily harm to that individual; or
>
> he knows that such acts will cause death to that individual; or
>
> he knows that such acts create a strong probability of death or great bodily harm to that individual; or
>
> he is attempting to commit or is committing the crime of Aggravated Battery."

As we have pointed out, the unique characteristic of felony murder is that it does not include an intent to kill, and it was error to instruct the jury that the defendants could be found guilty of attempted murder in the absence of such an intent. The last clause of instruction No. 20, when read in conjunction with instruction No. 19, tells the jury that the defendants may be found guilty of attempting to murder Harold Smith if the jury believes that the defendants committed an aggravated battery upon him. Such an instruction, applied to other forcible felonies, would mean that every person who commits burglary, or robbery, or rape, is guilty of attempt murder. For these

reasons the conviction of the defendants for the offense of attempt murder of Harold Smith must be reversed.

The jury was properly instructed as to self-defense and voluntary manslaughter. The events that resulted in the death of Jordan have been set out in considerable detail, and in our opinion they were sufficient to establish the defendants' guilt of the murder of Hector Jordan beyond a reasonable doubt.

The defendants contend further that their retained counsel was so incompetent and ineffective as to deprive them of due process, but we are not persuaded. They assert that the most serious blunder occurred when their attorney tendered two incomplete, legally inconsistent instructions regarding voluntary manslaughter. The "definitional" instruction given as defendants' No. 4 (IPI Criminal No. 7.05) was based on the theory of "unreasonable belief in justifying circumstances" (Ill. Rev. Stat. 1969, ch. 38, par. 9—2(b)). The "issues" instruction given as defendants' No. 5 (IPI Criminal No. 7.04), however, was based on the theory of "sudden and intense passion resulting from serious provocation" (Ill. Rev. Stat. 1969, ch. 38, par. 9—2(a)). The defendants argue that giving these instructions together was bound to confuse the jury. But the facts of this case could have supported either of the two voluntary manslaughter theories, and the defendants' attorney properly submitted instructions based upon both theories. Indeed, it would have been error for the court to refuse to give both instructions. *People v. Craven* (1973), 54 Ill.2d 419.

Nor is incompetence demonstrated because the attorney tendered only a "definitional" instruction on one theory and an "issues" instruction on the other. Of course it would have been better practice to submit both instructions with respect to both theories. Nevertheless, each of the two types of instructions stated the complete elements of the offense. Although the "issues" instruction emphasized that the State must prove the elements of the

offense beyond a reasonable doubt, the same result was achieved by the "definitional" instruction of the elements of the offense charged and the general charge as to the prosecution's burden of proof beyond a reasonable doubt.

The defendants advance other occurrences as demonstrating incompetence during the trial. In some instances, for example, defense counsel called witnesses to the stand without having previously interviewed them. In most cases, however, these witnesses were hospital personnel called near the close of the defendants' case in order to determine if Harold Smith or Hector Jordan was intoxicated when admitted to the hospital. The prejudice said to have occurred was that the jury's attention was redirected to the gruesome condition of Smith and Jordan. This interrogation was conducted, as counsel indicated to the court in chambers, because of an anonymous phone call to the effect that the head nurse had said that Smith and Jordan were intoxicated. Another instance of alleged incompetence involved an unresponsive answer given when counsel was cross-examining a police officer who had been with Smith and Jordan in the hospital.

We have examined other asserted instances of alleged incompetence which need not be discussed in detail. Considered in the aggregate, they do not, in our opinion, demonstrate such incompetence as would require a reversal of the judgment. Two of the six defendants represented by the attorney in question were acquitted, as was the single defendant represented by another attorney. The law does not require that all trials shall be perfect, but only that none shall be unfair. This trial was well within the boundaries of fairness.

The fourth ground for reversal asserted by the defendants is that the court gave prejudicial jury instructions. What was said in determining the propriety of the indictment for the murder of Hector Jordan disposes of the related contention concerning the instruction dealing with aggravated battery as the underlying felony in the.

felony murder instruction. We have already sustained the defendants' contention based upon the absence of a specific intent to kill in the instruction dealing with the attempt murder of Harold Smith.

The remaining contention concerns two instructions that were given by the court upon its own motion, over the objection of the defendants. The first of these defined "reasonable doubt." It read:

> "A reasonable doubt means a doubt that is based on reason and must be substantial rather than speculative. It must be sufficient to cause a reasonably prudent person to hesitate to act in the more important affairs of his life."

This court has previously held that the concept of reasonable doubt needs no definition and that the giving of an involved instruction defining it may be reversible error. (See *People v. Cagle* (1969), 41 Ill.2d 528, and cases cited therein.) We adhere to that view. The instruction in this case, however, is not involved, and while it should not have been given, we do not consider that it requires reversal.

The second instruction of which complaint is made is an *Allen* charge. Our opinion in *People v. Prim* (1972), 53 Ill.2d 62, carefully considered the desirability of instructions of this type in the light of the problems which they have created over the years. In the *Prim* case this court, in the exercise of its inherent and constitutional supervisory authority, directed that in the future trial courts faced with deadlocked juries should not use an *Allen* charge of the kind here given, but should instruct them in accordance with the suggestions contained in the American Bar Association's Minimum Standards relating to jury trials. In the present case, however, the challenged instruction was given to the jury before it had retired to deliberate. Moreover, our ruling in the *Prim* case applied only to cases tried thereafter, and the trial in this case took place well before the *Prim* case was decided. For these reasons we hold that the giving of this instruction does not require a reversal of the judgment.

We do not agree with the defendants' contention that they were deprived of their right to a fair trial by the prosecutor's improper statement in closing argument that the presumption of innocence had "now been stripped away" from the defendants. No objection was made to this statement at the trial, and it was followed almost at once by the following instruction:

> "Each defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.
>
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

The final contention of the defendants is that the consecutive sentences of 199 to 200 years for murder and 10 to 20 years for attempt murder were erroneous and excessive. We agree with this contention. Although the sentence for attempt murder must be reversed for reasons that have been stated, we think it is advisable to point out that consecutive sentences should not have been imposed in this case. See *People v. Quidd* (1949), 403 Ill. 15; *People v. Stingley* (1953), 414 Ill. 398; *People v. Williams* (1975), 60 Ill.2d 1; see also Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4.

The statute in force at the time sentence was imposed for the murder of Hector Jordan required the imposition of an indeterminate sentence. While the sentence imposed had the appearance of an indeterminate sentence, its effect was actually to frustrate the statutory purpose of an indeterminate sentence which "is to encourage rehabilitation of prisoners by holding out the possibility of early release on parole." (*People v. Harper* (1972), 50 Ill.2d 296, 301; see also *People v. Westbrook* (1952), 411 Ill. 301.) Moreover, the sentence imposed was unduly severe. The

murder here was not premeditated.

The judgment of conviction of the attempt murder of Harold Smith is reversed and the cause is remanded to the circuit court. The judgment of conviction of the murder of Hector Jordan is affirmed, but the sentence imposed upon each defendant for that offense is hereby reduced to an indeterminate sentence of not less than 50 years nor more than 75 years.

*Affirmed in part and reversed in part*
*and remanded; sentence modified.*