NO. 4-95-0523

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS ) Appeal from

Plaintiff-Appellee, ) Circuit Court of

v. ) Sangamon County

ANTONIO D. KIDD, ) No. 94CF0571

Defendant-Appellant. )

) Honorable

) Stuart H. Shiffman,

) Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

After a jury trial, defendant was found guilty of first degree murder (felony murder) and the aggravated battery of Anthony Lipsey.  720 ILCS 5/9-1(a)(3), 12-4(a) (West 1994).  On appeal, defendant argues (1) the trial court erred in refusing his proposed jury instructions for second degree murder, and (2) his sentence of imprisonment should be credited with one addi­tional day. 

On October 6, 1994, Anthony Lipsey (the victim) and Edwin Jones were walking down the street together when a man farther down the street yelled "hey" at them.  The man signaled to a porch full of men to join him.  Lipsey and Jones were then surrounded by additional people who came from a nearby alley.  A white car pulled up near them and four or five people from the car joined the crowd, including the defendant, Antonio Kidd, and Donnie Brown.  Defen­dant asserts he "wasn't thinking of nothing" when he walked up to where Lipsey and Jones were standing.  Jones backed away from the crowd and stood across the street.  An 

argu­ment ensued between Lipsey and the man who had yelled "hey," and the man hit Lipsey in the face.  

A fight then broke out between Lipsey and several members of the group, lasting approximately 5 to 10 minutes.  There is some dispute about who initiated the fight.  Defendant and Brown contend that Lipsey struck defendant on the side of the head with his hand, while holding a can, causing defendant to stagger backward.  Jones, however, maintains that Lipsey did not strike anyone before he was struck and that Lipsey threw punches only in an attempt to defend himself.  Jones did not see Lipsey holding anything in his hands.    

After Lipsey allegedly hit defendant, Brown and another man grabbed Lipsey as he tried to run away and pulled him back into the fight.  Brown and the other man hit Lipsey until defen­dant hit Lipsey "no more than three" times--twice in the face and "probably" in the chest area.  Defendant estimates 30 to 60 seconds elapsed between the time Lipsey struck defendant and defendant hit Lipsey.  During that time defendant decided it was "time *** to get [his] licks in."  Defendant admitted that at the time he hit Lipsey, Lipsey did not put him in fear of his safety, since Lipsey was being beaten by the other two men.  

After the fight, all the men left the area.  Jones went over to Lipsey, helped him up, and walked him home.  Lipsey reported the incident to the police.  Officer John Kohler of the Springfield police department was on duty on October 6, 1994, when Lipsey flagged him down.  Lipsey told Kohler that he had just been beaten up by four black males, who had also robbed him about one week earlier.  Lipsey explained that they beat him up because they did not want him to press charges against them for the prior robbery.  Lipsey identified one of the men as defendant Kidd.  At trial, Edwin Jones testified that the people who beat Lipsey were talking about someone taking money from Lipsey.  Cortessa Williams testified that on October 5, 1994, one day before the fight, she heard a conversation between Sylvester Anderson and defendant Kidd regarding someone they wanted to get even with.  Kidd stated that he had to get "him" for telling the police on them, but did not name anyone in particular.

Lipsey remained at home the evening of October 6.  Lipsey's mother and father, Betty and Joe, noticed bruises and swelling around his right eye, lip, and his right temporal area.  Lipsey refused suggestions by his parents to go to the hospital.  Betty checked on him periodically throughout the night.  When she checked around 6:15 a.m. on October 7, she noticed white liquid coming from his mouth, and his difficulty in breathing.  Lipsey did not respond when Joe shook him, and he eventually stopped breathing.  An ambulance took Lipsey to the hospital, where efforts to resuscitate him were unsuccessful.

On November 18, 1994, the State issued a two-count indictment against Antonio Kidd.  In count I, the State charged defendant with first degree murder (felony murder), in that "while committing a forcible felony, Aggravated Battery, *** [defendant] struck Anthony Lipsey in the head with his hand and thereby caused the death of Anthony Lipsey."  720 ILCS 5/9-1(a)(3) (West 1994).  Count II charged defendant with aggravated battery in that he "intentionally caused great bodily harm to Anthony Lipsey in that he struck Anthony Lipsey in the head with his fist."  720 ILCS 5/12-4(a) (West 1994).  Defendant was tried by a jury, along with codefendant Donnie Brown.  

During the jury trial, defendant testified that when he hit Lipsey on October 6, 1994, he did not believe his punches could have killed or caused great bodily harm to Lipsey.  During the fight, he had no idea that Lipsey would die.  Dr. Victor Lary performed Anthony Lipsey's autopsy on October 7, 1994, and concluded that the cause of Lipsey's death was a traumatic head injury resulting in an epidural hematoma, a large and relatively recent clot of blood located between the skull and the brain pressing downward on the brain.  Dr. Lary could not determine how much force created Lipsey's head injury, but said that blows to the head with a fist could cause an epidural hematoma.  

During the jury instructions conference, defendant's attorney tendered instructions for second degree murder based on provocation.  The trial court refused to give the second degree murder instructions, apparently finding the evidence insufficient to allow those instructions to be given and concluding that the case only raised the issue of whether defendant committed aggra­vated battery, the predicate offense for the felony murder charge.  
The jury subsequently found defendant guilty of first degree murder (felony murder) and aggravated battery.  
720 ILCS 5/9-1(a)(3),12-4(a)
 (West 1994). The trial court sen­tenced defen­dant to 25 years' imprisonment and awarded him credit for 228 days served.  

Defendant filed a posttrial motion arguing the trial court erred in not instructing the jury on second degree murder.  Defendant argued those instructions should have been given because the evidence showed defendant had no felonious intent prior to being struck in the head by Lipsey.  In addition, because Lipsey struck defendant first, Lipsey was the initial aggressor, which caused the defendant to act under a sudden and intense passion resulting from serious provocation by Lipsey.  The court denied defendant's posttrial motion.  This appeal followed.      

Prior to 1987, Illinois defined voluntary manslaughter to include the situation where the defendant "is acting under a sudden and intense passion resulting from serious provocation."  Ill. Rev. Stat. 1985, ch. 38, par. 9-2(a).  Since 1987, provoca­tion has been addressed by the second degree murder stat­ute, which made significant changes in that defense.  720 ILCS 5/9-2(a)(West 1994).  

Defendant recognizes that in most felony murder cases it should not be a defense that a defendant is provoked, but he argues the defense is available in this case, citing 
People v. Williams
, 164 Ill. App. 3d 99, 109, 517 N.E.2d 745, 751 (1987).  A person who intends to rob a shopkeeper or rape an individual is not allowed to claim that he was provoked by his victim or to raise any other affirmative defense if, in the course of commit­ting the original felony, the intended victim or any other person is killed.  
Williams
, 164 Ill. App. 3d at 109, 517 N.E.2d at 751.  The argument that a defendant was provoked to commit the robbery or rape in which the victim was killed simi­larly has no merit.  Mental state is irrelevant.  "It is immate­ri­al whether the killing in such case is inten­tion­al or acciden­tal, or is commit­ted by a confeder­ate without the conniv­ance of the defen­dant."  Ill. Ann. Stat. ch. 38, par. 9-1, Committee Com­ments--1961, at 16  Smith-Hurd (1979).  
Williams
 held, however, that in the unusual fact situa­tion before it the provo­cation defense should have been avail­able.  

In 
People v. Viser
, 62 Ill. 2d 568, 343 N.E.2d 903 (1975), the court considered whether felony murder could be charged when the predicate felony was the aggravated battery that resulted in the victim's death.  In 
Viser
, a chance dispute between two groups of people who did not know each other resulted in the aggravated battery of two victims, one of whom died a few days later.  The supreme court recognized that other states had held that an assault upon the person killed could not be made the basis of a felony murder charge.  
Viser
, 62 Ill. 2d at 579, 343 N.E.2d at 909.  The court was troubled, however, that in the case before it the argu­ment was only a technical one:  if the indict­ment had charged that the deceased victim had been killed during the commis­sion of an aggravated battery on the surviving victim, the indictment would have been proper.  
Viser
, 62 Ill. 2d at 578, 343 N.E.2d at 908.  

The supreme court noted that most felony murders involve an aggravated battery or an assault, and it declined to rule out felony murder prosecutions in such cases simply because of the absence of an intention to commit another felony, espe­cially in light of the legislature's "forthright character­ization of aggravated battery as one of the forcible felonies that will trigger a charge of felony murder."  
Viser
, 62 Ill. 2d at 579-80, 343 N.E.2d at 909; see 720 ILCS 5/2-8 (West 1994) (definition of "forcible felony").  If a person chooses to engage in dangerous conduct from which death is likely to result (and forcible felo­nies constitute such conduct), that person should be liable for felony murder whether the dangerous conduct consists of robbery, crimi­nal sexual assault, or aggravated battery resulting in great bodily harm.   

There are reasons why a prosecutor, seeking a first degree murder conviction, might choose to charge felony murder under section 9-1(a)(3), even when a charge of inten­tion­al or knowing murder is possible under section 9-1(a)(1) or (a)(2).  First, the prosecutor will not have to show that there was any intent to kill when the charge is felony murder.  Second, the provocation defense may not be available when the charge is felony murder.  
Viser
 clearly held the first proposi­tion to be the law.  "What was intended was to deter the commis­sion of any of the enumerated forcible felo­nies, including aggravated bat­tery, by holding the perpetrator responsible for murder if death results."  
Viser
, 62 Ill. 2d at 580, 343 N.E.2d at 909.  
Viser
 did not hold the second proposition to be law.  An in­struc­tion on the provocation defense was given in 
Viser
, and the supreme court held that it would have been error to have refused that instruc­tion.  
Viser
, 62 Ill. 2d at 583, 343 N.E.2d at 911.  There were also charges of intentional and knowing murder in 
Viser
, for which the in­struc­tion clearly would have been appro­priate, but it appears the jury returned a guilty verdict on only the felony murder count.  

It is not the law that a prose­cutor may avoid the provo­cation defense in an intentional or knowing murder case by charging felony murder based upon an aggravated battery upon the person killed.  The procedure to be followed in that situation was addressed in 
Williams
, where the court concluded there should be an instruction on the defense, even though provocation is not a defense to aggra­vat­ed bat­tery and is not usually a defense to felony murder.  
Williams
 would not allow the defense where the provocation occurred during the commission of the forcible felony, as where a shopkeeper resisted a robber.  
Wil­liams
, 164 Ill. App. 3d at 109, 517 N.E.2d at 751.  However, where provoca­tion occurs prior to the time that a defendant forms a felonious intent or commits an aggravated battery, defendant is entitled to the defense.  
Williams
, 164 Ill. App. 3d at 110, 517 N.E.2d at 752.  Otherwise prosecutors could avoid the defense in every case of first degree murder, even in cases that are clearly inten­tion­al or knowing murder cases.  

The State argues that, in 1987, when the legislature adopted the second degree murder statute, it specifically provid­ed that the defense of provocation applied only to intentional or knowing murder and could never apply to felony murder.  See 720 ILCS 5/9-2(a) (West 1994) ("A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in para­graphs (1) or (2) of subsection (a) of Section 9-1***").  The State did not make that argument in the trial court.  That argu­ment would effectively eliminate the second degree murder stat­ute in intentional or knowing murder cases.  If the prose­cu­tor has the evi­dence to defeat a claim of provoca­tion, he may charge knowing or inten­tional murder.  If he does not have that evi­dence, he may prevent the claim from being raised by charging felony murder, based on aggravated battery.  See 
Viser
, 62 Ill. 2d at 578-79, 343 N.E.2d at 908-09.  

Did the legislature really intend an illusory second degree murder statute, one that exists at the choice of the prose­cutor and will be applied only in cases in which it could be of no benefit to the defendant?  We should avoid a con­struc­tion of a statute that renders any part of it meaning­less.  
The courts presume that the General Assembly, in passing legisla­tion, did not intend absurdi­ty, inconvenience or injus­tice, and a statute will be interpreted so as to avoid a con­struction that would raise doubts as to its validity.  
Harris v. Manor Healthcare Corp.
, 111 Ill. 2d 350, 363, 489 N.E.2d 1374, 1379 (1986).  A court should avoid an inter­pre­ta­tion under which a statute is "ex­plained away, or rendered insignifi­cant, meaning­less, inopera­tive, or nugatory."  
Pliakos v. Illinois Liquor Control Comm'n
, 11 Ill. 2d 456, 460, 143 N.E.2d 47, 49 (1957).  In order to give some meaning to the second degree murder stat­ute, there must be some limit on a prosecutor's ability to charge felony murder in cases such as this.  We need not consider what that limit should be, however, as we may decide this case on the issue addressed in the trial court, whether defen­dant pre­sented sufficient evidence to warrant the giving of the provocation instruc­tion.  

It does not appear that the prosecutor in this case charged felony murder when the proper charge was intentional or knowing murder.  Defendant did not use any weapon and may have hit Lipsey only two or three times with his fists, and Lipsey walked away from the alter­ca­tion.  Lipsey did not believe his injuries were so serious as to require medical attention.  Perhaps defen­dant did not "in­tend[] to kill or do great bodily harm to" Lipsey or "know[] that such acts will cause death" or "know[] that such acts create a strong probabil­ity of death or great bodily harm."  720 ILCS 5/9-1(a)(1), (a)(2) (West 1994).  It may be that if the State had made the argument in the trial court that it makes now, the trial court could have refused the provo­cation instruction on that basis.  The State did not do so, howev­er, and the question before us is whether defendant present­ed sufficient evidence to warrant the instruction.

A person commits second degree murder when "[a]t the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed."  720 ILCS 5/9-2(a)(1) (West 1994).  The Criminal Code of 1961 defines "serious provocation" as "conduct sufficient to excite an intense passion in a reasonable person."  720 ILCS 5/9-2(b) (West 1994).  The defendant must be acting under a sudden and intense passion spurred from serious provocation that the law recognizes as reasonable.  
People v. Garcia
, 165 Ill. 2d 409, 429, 651 N.E.2d 100, 110 (1995).  Illinois courts recognize four catego­ries of provocation:  (1) substantial physical injury or substan­tial physical assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse.  
Garcia
, 165 Ill. 2d at 429, 651 N.E.2d at 110.  Mutual quarrel or combat is a "fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat."  
People v. Austin
, 133 Ill. 2d 118, 125, 549 N.E.2d 331, 334 (1989).  

Whether to issue a specific jury instruction is within the province of the trial court, and such a decision will not be reversed unless it is an abuse of discretion.  
Garcia
, 165 Ill. 2d at 432, 651 N.E.2d at 111; 
Austin
, 133 Ill. 2d at 124-25, 549 N.E.2d at 333-34.  If there is evidence that if believed by the jury would reduce a crime from first degree murder to second degree murder, defendant's requested second degree murder in­struction must be granted.  However, the defendant has the burden of proving that at least "some evidence" of serious provocation exists, otherwise the trial court may deny giving the instruc­tion.  
Austin
, 133 Ill. 2d at 125, 549 N.E.2d at 334.  

We hold the trial court did not abuse its discretion in refusing to give defendant's second degree murder provocation instruction because defendant did not present sufficient evidence to warrant giving that instruction.  No real evidence exists that shows defendant was acting under a sudden and intense passion resulting from serious provocation at the time he beat Lipsey.          Defendant argues that when he beat Lipsey he acted under a sudden and intense passion from serious provocation, but he does not specify under which of the four recognized categories of provocation the situation falls.  It appears the only possible applicable category would be mutual quarrel or combat.  However, we hold that this situation did not constitute mutual combat; consequently, defendant was not entitled to present the second degree murder instructions to the jury.

Defendant did not satisfy the mutual combat or quarrel standard as he presented no evidence indicating Lipsey willingly entered into the struggle or that the fight was on equal terms.  Clearly this was not a one-on-one situation as Lipsey was ini­tially surrounded by approximately 16 men.  Furthermore, there is evidence that indicates defendant and the others may have planned this incident in response to Lipsey reporting them to the police for previously robbing him and to prevent him from press­ing charges against them.  Even if Lipsey struck defendant in the head, this was not serious provocation, as Lipsey was probably trying to break free from the crowd, not instigate an alterca­tion.  Lipsey did try and escape the crowd once, but was pulled back by two of the men.  It was during the time these two men were beating Lipsey that defendant decided it was "time to get [his] licks in."

Defendant also contends that his sentence of imprison­ment must be credited with one additional day as he served 229 days in the Sangamon County jail and the trial court only credit­ed his sentence with 228 days.  The State agrees that defendant is entitled to 229 days of credit.   The Unified Code of Correc­tions provides that a defendant shall be given credit on his sentence for time he spent in custody.  730 ILCS 5/5-8-7(b) (West 1994); 
People v. Donnelly
, 226 Ill. App. 3d 771, 779, 589 N.E.2d 975, 980 (1992).  Defendant was in custody from November 6, 1994, through June 22, 1995, a total of 229 days, and is entitled to 229 days of credit on his sentence.  

For the foregoing reasons, the judgment of the circuit court of Sangamon County is affirmed as modified and remand­ed for issuance of an amended judgment of sentence reflecting defen-dant's entitlement to 229 days' credit on his sen­tence.     

Affirmed as modified and remanded with directions.

McCULLOUGH, J., concurs.

STEIGMANN, J., specially concurs.

JUSTICE STEIGMANN, specially concurring:

In 1986, the legislature enacted Public Act 84-1450 (Pub. Act 84-1450, eff. July 1, 1987 (1986 Ill. Laws 4222)), which renamed the offense of murder to first degree murder, abolished the offense of voluntary manslaughter, and replaced it with second degree murder.  As the supreme court explained in 
People v. Jeffries
, 164 Ill. 2d 104, 111, 646 N.E.2d 587, 590 (1995), "[t]he intent of the legisla­ture in enacting Public Act 84-1450
 was to remedy the confusion and inconsistency that had developed in regard to the murder and voluntary man­slaughter statutes."  Part of that confusion and inconsistency dealt with the relationship of voluntary manslaughter to murder when a defendant was charged under the felony murder provision of the former murder statute.   

In 
Williams
, this court struggled with that relation­ship, noting that in most instances in which a defendant is charged with murder under the former stat­ute, "the reduction in culpability [that is, a reduction to a voluntary manslaughter conviction] due to passion should not be available as a partial defense to a felony murder charge."  
Williams
, 164 Ill. App. 3d at 108, 517 N.E.2d at 751.  However, the court then noted that "under the unusual fact situation presented by defendant's testimony in the instant case, the jury should have been given the provocation-voluntary man­slaughter instruction in conjunction with the felony murder charge."  
Williams
, 164 Ill. App. 3d at 108, 517 N.E.2d at 751.  In support, the 
Williams
 court cited 
Viser
, in which--accord­ing to the 
Wil­liams
 court--the supreme court stated that it would have been error for the trial court to refuse to give a voluntary manslaugh­ter instruction in a case involving a charge of felony murder.

However, 
Williams
 provides no support for the majority's holding here because (1) the legis­la­ture changed the voluntary man­slaugh­ter statute upon which 
Williams
 is based when it created the offense of second degree murder; and (2) part of the reason the legislature did so was 
specifically
 to reject the position the majority now adopts.  In other words, as 
Viser
 and 
Williams
 demonstrate, confusion existed under the "old law" regard­ing whether a voluntary man­slaughter convic­tion 
could
 result when the defendant was charged only with felony murder.  Note that in defining voluntary man­slaughter, section 9-2(a) of the Criminal Code of 1961 (Code) stated simply that "[a] person who kills an indi­vidual without lawful justification commits volun­tary man­slaugh­ter" if at the time of the killing, he acted under serious provocation or an imper­fect self-defense.  Ill. Rev. Stat. 1985, ch. 38, par. 9-2(a).  On the other hand, second degree murder as now defined in section 9-2(a) of the Code provides, in relevant part, that a person commits that offense "
when
 
he
 
commits
 
the
 
offense
 
of
 
first
 
degree
 
murder
 
as
 
defined
 
in
 
paragraphs
 
(1)
 
or
 
(2)
 
of
 
subsection
 
(a)
 
of
 
Section
 
9-1
 
of
 
this
 
Code
" and either mitigat­ing factor is present.  (Emphasis added.)  720 ILCS 5/9-2(a) (West 1994).  

First degree murder can be committed in either of the following separate and distinct ways:  (1) "know­ing or inten­tion­al" murder (sections 9-1(a)(1) and (a)(2) of the Code), or (2) felony murder (section 9-1(a)(3) of the Code).  By specif­i­cally refer­ring to subsec­tions 9-1(a)(1) and (a)(2) of the Code in defin­ing second degree murder, the legislature made clear that second degree murder can be committed 
only
 when a defendant commits "knowing or intention­al" murder.  This is no oversight.  If the legislature had intended to include felony murder as a possible basis (when either section 9-2(a) mitigating factor is present) for second degree murder, all it needed to say in defin­ing second degree murder is that a person commits that offense when he commits the offense of first degree murder and either of the mitigating factors is present--the same language, in other words, that the legisla­ture had used to describe (under the "old law") when a charge of murder could serve as a possible basis for voluntary manslaughter.   Other than to change the name of the offense, Public Act 84-1450 left section 9-1 of the Code (defining murder) the same in all partic­u­lars.  Under Public Act 84-1450, the primary change to section 9-2 of the Code (besides the change of name) was to place the burden of proof on a defendant who asserts the presence of mitigating factors.  (Note that the statutory defini­tion of mitigating factors was not changed from the old section 9-2 to the new statute.)  In fact, other than shifting the burden of proof, the 
single
 
biggest
 
change
 between voluntary manslaughter and second degree murder is the new definition of second degree murder which--
on
 
its
 
face
--omits the possibility that second degree murder can be based upon felony murder. 

The question that the majority should address is this:  other than the result I claim was intended when the legislature enacted the statute--namely, to achieve the specific result of ensuring that second degree murder could never be based upon felony murder--what possible explanation can the majority provide for this change in the language of section 9-2(a)? 

Assuming, for the moment, that the legislature did not wish to permit felony murder to serve as a predicate for second degree murder, how could it possibly have made its views more clear?  I suggest the only way it could have done so is by using a legisla­tive device that it heretofore has never used--namely, by adding the following sentence to section 9-2 of the Code (perhaps as a new subsection (b)):  "The omission of any reference to paragraph (3) of subsec­tion (a) of section 9-1 of this Code within the defini­tion of second degree murder was intentional to ensure that felony murder may not consti­tute the predi­cate for a second degree murder convic­tion."  

Defining criminal offenses--and providing for mitigat­ed homicides, if that is the legislature's wish--lies entirely within the legislature's province.  It was not compelled to provide that the presence of mitigating factors would reduce a defendant's commission of first degree murder to second degree murder, a lesser mitigated of­fense.  See 
Jeffries
, 164 Ill. 2d at 122, 646 N.E.2d at 595.  Nor, once the legislature decided to make 
some
 first degree murders (the "intentional or knowing" murders) capable of being miti­gat­ed into second degree mur­ders, was it compelled to make 
all
 first degree murders (including felony murders) capable of being miti­gat­ed into second degree murders.  (For a comprehensive discussion of the changes in Illinois' murder statute and the policies underlying those changes, see D. Shanes, 
Murder Plus Mitiga­tion:  The "Lesser Miti­gated Offense" Arrives in Illinois
, 27 J. Marshall L. Rev. 61 (1993).)  

The majority simply disap­proves of how the legis­lature has chosen to define second degree murder and thinks it should be defined broadly enough so that second degree murder could result when a defendant is charged only with felony murder.  The majority's holding is inconsistent with the words of the supreme court in 
Jeffries
, when that court spoke of the deference due the legisla­ture in enact­ing stat­utes--indeed, the very statutes at issue in this case:  

              "[W]e recognize that the judi­cial role in

          construing statutes is to ascertain legisla-

     ­     tive intent and give it effect.  To accom­plish

          this goal, a court will seek to deter­mine the

          objective the legislature sought to accom­plish

          and the evils it desired to reme­dy."

          
Jeffries
, 164 Ill. 2d at 110, 646 N.E.2d at

          590. 

Regarding the 
Pliakos
 case--which holds that a court should avoid an interpretation under which a statute is explained away, or rendered insignificant, meaningless, inopera­tive, or nugatory--the essential point is that section 9-2 of the Code in defin­ing second degree murder neither requires nor permits 
an
 
inter­preta­tion
; that statute is clear on its face in that it refers only to knowing and inten­tional murder under section 9-1(a)(1) or (a)(2) of the Code--not 9-1(a)(3), defining felony murder.

The majority's concern that, under my view, second degree murder would no longer exist is not supported by experience.  Ten years have now passed since the enact­ment of the first and second degree murder stat­ute, and there has been no shortage of juries either being in­struct­ed upon--or finding defendants guilty of--second degree murder.   

The Code was enacted in 1961 (at which time the modern versions of murder and volun­tary manslaugh­ter were enact­ed), which means that 25 years passed before an appel­late court (
Williams
) held that--under limited circumstanc­es--volun­tary manslaughter could be premised upon a felony murder count.  And during the 10 years that have passed since 
Wil­liams
 was decided, 
not
 
a
 
sin­gle
 
case
 has similarly held that second degree murder can be based upon a felony murder count.