Melissa Phillips **HOLLAND, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 1998–SC–0915–MR.

Supreme Court of Kentucky.

Sept. 18, 2003.

As Modified Sept. 22, 2003.

Susan Jackson Balliet, Asst. Public Advocate, Frankfort, for appellant.

A.B. Chandler, III, Atty. Gen., Kent T. Young, Dana M. Todd, Asst. Atty. Gens., Office of Atty. Gen., Criminal Appellate Division, Frankfort, for appellee.

KELLER, Justice.

## I. INTRODUCTION

A Hardin Circuit Court Jury found Appellant guilty of two (2) counts of Attempted Murder and one (1) count of First–Degree Burglary, fixed Appellant's sentences at fifteen (15), fifteen (15), and ten (10) years, respectively, and recommended that the sentences run consecutively for a total prison sentence of forty (40) years. The trial court entered judgment in accordance with the jury's verdict, and Appellant now appeals to this Court as a matter-of-right.[1] After a review of the record, we hold that the trial court's jury instructions were prejudicially erroneous, and we thus reverse the Judgment and Order Imposing Sentence and remand the indictment to the Hardin Circuit Court for a new trial.

## II. FACTUAL BACKGROUND

In April 1997, a Hardin County Grand Jury returned a three (3) count indictment against Appellant. Counts One and Two charged Appellant with Attempted Murder and alleged that "with the intent to cause the death of Danny E. [and, in Count Two, Rebecca] Darnell or under circumstances manifesting an extreme indifference to human life, she wantonly engaged in conduct which created a grave risk of death[2] to Danny E. [/Rebecca] Darnell, she shot Danny E. [/Rebecca] Darnell ... and thereby caused serious physical injury to him [/her] at 1411 Kentucky Drive, Apartment C, Elizabethtown, Kentucky, in an attempt to cause his [/her] death." Count Three charged her with one (1) count of First–Degree Burglary and alleged that "with the intent to commit a crime, she knowingly and unlawfully entered the residence of Danny E. Darnell, 1411 Kentucky Drive, Apartment C, Eliza-

1. KY. CONST. § 110(2)(b).

2. Although the indictment appears to charge Appellant alternatively with both Attempted KRS 507.020(1)(a) Intentional Murder and Attempted KRS 507.020(1)(b) Wanton Murder, the trial court properly ruled that the Kentucky Penal Code does not recognize Attempted KRS 507.020(1)(b) Wanton Murder as a criminal offense because " 'there is no such criminal offense as an attempt to achieve an unintended result.' " See Prince v. Commonwealth, Ky.App., 987 S.W.2d 324, 326 (1999) (quoting People v. Viser, 62 Ill.2d 568, 343 N.E.2d 903, 910 (1975)). Accordingly, the trial court's Attempted Murder jury instructions correctly embraced only Attempted KRS 507.020(1)(a) Intentional Murder.

bethtown, Kentucky, and while in the residence, she was armed with a handgun."

In her defense, Appellant admitted the majority of the indictment's factual allegations. In particular, Appellant did not dispute that she shot Danny Darnell ("Darnell") and his ex-wife, Rebecca Darnell ("Becky Darnell"), inside Darnell's apartment with a handgun that she had acquired the previous day. Instead, the issues for jury resolution at trial related to Appellant's state of mind at the time of the shooting, i.e., her degree of intoxication and whether she intended to kill Danny and Becky Darnell. The Commonwealth's theory of the case was that Appellant, who was jealous of the fact that her lover, Darnell, was making efforts to reconcile with his ex-wife, unlawfully entered his apartment, waited there with her recently-purchased handgun, and, when Danny and Becky Darnell arrived, shot each of them in cold blood and with the intent to kill. In contrast, Appellant defended against the charges by arguing that: (1) because of an assortment of pain medication she was taking pursuant to prescriptions she was given after her back surgery less than a week earlier, she did not recall much about that day, and specifically did not remember traveling to or entering Appellant's apartment, (2) "she never wanted to go in there and kill anybody" and she assumes instead that her intent was to kill herself in Darnell's presence (or to attempt to do so to see if he would try to stop her) with the handgun that she had purchased for that purpose after unsuccessfully attempting to commit suicide by ingesting pills twice earlier that year; and (3) that the shootings themselves "happened so fast" after Darnell sarcastically remarked to her "Go ahead, shoot me, Melissa, right between the eyes. Put me out of my misery" and suddenly moved towards her, but that she "didn't want to kill anybody" and was in fact unaware that she had shot Becky Darnell at all.

Given the nature of Appellant's defense to the charges, much of the evidence at trial concerned the deterioration of the romantic relationship between Appellant and Darnell and its effect on her mental state. Because we find Appellant's testimony[3] regarding the relationship important to our analysis of Appellant's allegation that the trial court improperly denied her a lesser-included offense instruction, we will summarize it in some detail.

In February 1995, Appellant first met Darnell at the Fort Knox enlisted club where Darnell's band was playing. At that time, each of them was married, but each was separated from his or her spouse. Appellant was married to a man named Stacy Holland with whom she had lived in Colorado, Ohio, and, most recently, Indiana until he left her in January 1995,

---

**3.** We recognize and emphasize that Darnell disputed portions of Appellant's testimony regarding their romantic relationship. While some of Appellant's account was corroborated by other witnesses, much of the testimony concerning the relationship came from Appellant herself. And, although we present largely one side of that story when we summarize the testimony presented in Appellant's behalf, we do so in recognition that a fact-finder could reasonably disbelieve portions of it. Time and space permitting, we would itemize each point upon which Appellant's victims disagree with her version in order to prevent any inference that the account described here is "the official version." Because it is the trial court's incomplete jury instructions that entitle Appellant to a new trial, however, we structure the factual background with an eye towards the instructional omissions. And we focus on Appellant's proof because a trial court must instruct the jury on the whole law of the case, see infra notes 8 and 9 and surrounding text. Additional instructions were warranted in this case because a jury reasonably could have believed Appellant's version of the events and further believed that those events affected her as she described.

and Darnell was married to Becky Darnell. According to Appellant, however, Darnell told her at that time or soon thereafter that he had been divorced for two (2) years. During March and April 1995, Appellant and Darnell met each other two (2) to three (3) times per week for lunch or dinner. Later in April, however, Appellant discovered that she was pregnant with her husband's child, and she made a brief attempt to reconcile with him that ultimately proved unsuccessful. Soon after she returned from Oklahoma, she contacted Darnell to tell him that her reconciliation with her husband was not going to work out. The relationship between Appellant and Darnell then became sexual.

Not long after her return, Appellant suffered a miscarriage. She became depressed, considered suicide, applied to purchase a handgun, and contacted a pastor who gave her the number of a suicide crisis line. In August, 1995, Appellant moved in with a friend in Shelbyville, Kentucky, and her relationship with Darnell appeared to progress. Darnell took Appellant with him on a trip to Charleston, South Carolina, and they stopped by Appellant's father's place in North Carolina so that she could introduce Darnell to her family. Sometime during this period Darnell gave Appellant a key to his apartment. A couple of months later, however, problems began to develop in the relationship when Appellant began to broach the topic of marriage and children. On Thanksgiving 1995, Darnell met Appellant at her parents' home and, after receiving a telephone call from his then-ex-wife (his divorce having become final in July 1995), he confessed that he had lied to Appellant when he told her that he had been divorced for two (2) years. Appellant testified at trial that, in retrospect, this event represented a turning point in their relationship because afterwards she began to realize that Darnell did not actually love her, and that she was little more than a young, attractive sexual outlet "rebound." As mounting debts from her marriage forced her to seek bankruptcy protection, she again began to consider ending her life.

On New Years' Day 1996, Darnell and Appellant had a conversation that Appellant interpreted as a marriage proposal. A week later, however, when she confronted him and inquired whether he was serious about the proposal, Darnell told Appellant that he had "proposed" merely to keep her in the relationship. This event precipitated Appellant's first suicide attempt. On January 8, 1996, before retiring to bed with Darnell, Appellant ingested a quantity of the muscle relaxants she took for her back pain, and she later awoke feeling numb and vomiting blood. Darnell called poison control and took her to the hospital, where she was hospitalized for a day-and-a-half in a psychiatric ward.

In March 1996, Appellant was looking for a new place to live because her roommate in Shelbyville was getting married. Darnell located an apartment for Appellant in Radcliff, Kentucky and "fronted" her deposit and first month's rent because he wanted her to live closer to him. Appellant and Darnell then began spending virtually every night together at either his or her apartment. More problems arose in the relationship soon thereafter, however, when Darnell began to seriously consider reconciling with his ex-wife.

On April 29, 1996, Appellant again attempted suicide after being fired from her job and having a fight with Darnell. She called Darnell and told him of her intentions, to which he responded, "It's your choice" and hung up his end of the phone. Appellant then went to Darnell's apartment and called her sister to inform her of her plans to end her life, wrote out a check

to her sister for the balance of her bank account, and proceeded to swallow one hundred (100) of the same back medication pills that she had taken during the earlier suicide attempt. She took the pills in Darnell's presence, and Darnell, as he described it, "handled it improperly and used poor judgment." According to Appellant, Darnell told her "you can't lay here with those pills in your stomach," told her to "[g]et [her]self to the hospital," and then started berating her for having the audacity to die on his apartment floor when she told him that she was unable to drive. Appellant then called the 911 operator, but Darnell grabbed the phone and informed the operator that everything was under control and no emergency services were needed. However, an ambulance eventually arrived after Appellant called back and told the operator about the pills she had taken. Appellant was in a coma for three (3) days, and she remained in the hospital for a week.

When she was discharged from the hospital, Appellant traveled to North Carolina and stayed there with her father and his wife for one (1) night before returning to Radcliff. The day after she returned, Darnell told her that he was going to a divorce reconciliation counseling seminar with his ex-wife, but Appellant and Darnell continued their sexual relationship, and Darnell assured Appellant that he would help her convalesce after the back surgery that she had scheduled for mid-June. When Becky Darnell voiced her objection to this plan, Appellant and Becky Darnell met and talked for about an hour. During that time, Appellant explained to Becky Darnell that she had no objection to, and would fully accept, the reconciliation if Darnell would help her recover after the

surgery. She explained that her psychiatrist did not want her home alone because of concerns that the medications would exaggerate her emotional condition, but she had no family or friends nearby to stay with her and she could not afford home health care. Although Becky Darnell did not believe Appellant was sincere, she somewhat reluctantly consented to the arrangement. Appellant and Darnell continued their sexual relationship, but Darnell's equivocation regarding his feelings for her affected Appellant emotionally. On June 10, 1996, Appellant applied to purchase a handgun in contemplation of taking her own life and told Darnell that if she killed herself, she would do so in his presence.

Appellant's surgery was scheduled for June 18, 1996, and, the night following his return from a weekend trip with his ex-wife, which was also the night before Appellant's surgery, Darnell stayed at Appellant's apartment and he and Appellant were intimate. That same night, after she argued with Darnell over what she perceived to be his attempt to make her feel guilty for sleeping with him, Appellant spoke with her friend Susan Brandingham ("Brandingham") and told her of her plans to kill herself. Then, according to Appellant, she and Darnell were again intimate the next morning on the way to the hospital after Darnell suggested that they pull over and make love in the woods.

Appellant was discharged from the hospital on June 20, 1996, and Darnell was there to pick her up. Her doctors had prescribed a number of pain medications—specifically Darvon to be taken "as needed," Percocet to be taken "as needed," and Valium to be taken every six (6) hours.[4]

---

4. Dr. Robert Rapp, a professor of drug research at the University of Kentucky, testified that: (1) the combination of Darvon, Percocet, and Valium is typically given to hospital patients, but not those on an outpatient basis; (2) the medications were much more danger-

Darnell took Appellant home from the hospital to her apartment, gave Appellant her medications, and Appellant went to sleep. When she awoke early in the morning hours of June 21, 1996 she was disoriented and confused because she could not find Darnell. Although she admits she should not have been driving, Appellant drove to Darnell's apartment, let herself in, walked upstairs, and found Darnell sleeping in bed with his ex-wife. She retreated from Darnell's bedroom, but Darnell awoke and followed her down the stairs where they began arguing about why he had not stayed at Appellant's apartment. Appellant accused Darnell of "using" her for sex and then called up the stairs "Becky, he doesn't love you, and he doesn't love me ... He's playing with both our emotions." According to Appellant, Darnell then grabbed her around the neck, slammed her against the wall, told her "shut up, you're not going to tell her nothing," and then grabbed her by her feet and dragged her the rest of the way down the stairs. Appellant attempted to use the phone, but Darnell grabbed it away from her, escorted her out of the apartment and, according to Darnell, took the key to his apartment from her and instructed her not to return.

Appellant then went to the police station where she told them of Darnell's assault upon her, but she was told that she did not meet the criteria for an EPO. After a return trip to the VA hospital to receive treatment for injuries she received from the assault, Appellant, while still wearing hospital attire, proceeded to run errands. Although the dealer from whom she purchased her .380 handgun denies that Appellant was wearing a hospital gown when she did so, he admitted during his testimony that Appellant was wearing a hospital wristband, had shaky handwriting, and told him that she had just left the hospital. Later that afternoon, Appellant appeared at her husband's attorney's office in Louisville, and an attorney in the office verified that, at that time, she was dressed in a hospital gown and slippers. One of the attorneys called Darnell, who was representing Appellant in the divorce action, and Darnell apologized to her for hurting her the night before.

Although Appellant has little memory of the day prior to the shooting, she apparently arrived at her apartment at some point on Friday evening or Saturday morning, because she was awoken on Saturday morning by a call from her brother, who testified that Appellant was groggy and incoherent, and that she explained her state on her medications. After the conversation with her brother ended, Appellant was unable to understand why she had not heard from Darnell, and she took her handgun with her, drove to Darnell's apartment, and, when she did not find him there, crawled into his bed. Eventually, she called her own apartment to check her messages to see if Darnell had called her. She discovered a message from Brandingham and then, crying and emotionally upset, returned her call to tell her that she had a gun and was going to kill herself. Brandingham had her husband use his cellular phone to call the police, and they arrived at Darnell's apartment while Appellant was still on the phone with Brandingham. After speaking with Appellant, one of the officers concluded that she should not be left alone because she appeared over-medicated and was drowsy,

ous in combination and could have a synergistic effect that could cause the patient to experience excessive sleeping, difficulty waking up and thinking normally, and amnesia; and (3) patients are supposed to follow the dose directions, but the medications themselves could affect a patient's judgment and or memory and cause him or her to deviate from the directions.

groggy, with slurred speech, glassy eyes and a lack of coordination. The police thus took Appellant to Brandingham's residence. After talking with Appellant for a period of time, however, Brandingham drove her back over to Darnell's apartment so that Appellant could collect her belongings. Appellant decided to admit herself into the VA hospital, and she left a note on Darnell's door to that effect, but Appellant was unable to remember whether she in fact attempted to admit herself to the VA because she professes to have no memory of the night before the shooting.

According to Appellant, the next thing she remembered was waking up in Darnell's bed on Sunday morning, June 23, 1996 with the handgun in her right pocket. Appellant's next door neighbor testified, however, that: (1) he observed Appellant at around 8:00 a.m. on Sunday; and (2) she appeared to be heavily medicated because she had a lot of trouble coming down the steps of the apartment complex and, although he spoke to her regarding whether she should be driving, he could not understand everything she said in return.

Although it is undisputed that Danny and Becky Darnell eventually came to Darnell's apartment and that Appellant subsequently shot them and fled to Oklahoma, Appellant's account of the shooting itself, which is described above, differs substantially from her victims' accounts. According to the testimony of Danny and Becky Darnell, Appellant: (1) stood up with her hands behind her back when Darnell entered his bedroom and inquired why he had not called her; (2) Darnell shouted downstairs that Becky Darnell should call the police;[5] (3) Appellant shouted to Becky Darnell that she should not go anywhere or "I'll kill him right now"; (4) Appellant brought her handgun out from behind her back, pointed it at Darnell, and told him that he had ruined her life; (5) Darnell responded that it was not possible to talk with a gun pointed at him; (6) Appellant responded by staring at him "as if she could stare a hole" through him and then started talking about Becky Darnell, to which Darnell responded that the problems he and Appellant had were between the two of them, and not his ex-wife; (7) Darnell then moved towards his bedroom door and started motioning to Becky Darnell for her to leave the apartment; (8) Appellant, who Darnell described as angry-looking but calm, then fired a shot from about five to six feet away, and Darnell felt a burn across his cheek, but the round struck the wall behind him; (9) Darnell then shouted to his ex-wife that Appellant's weapon was loaded with blanks, and, as soon as he did so, Appellant fired her weapon again and hit Darnell in the chest; (10) as Darnell staggered backwards, Appellant stood there looking at him and, without moving her hands from their firing position, fired a third time and hit Darnell in the abdominal area; (11) Darnell screamed at his ex-wife to get out of the apartment as Appellant "stood there like a statue" and fired three more shots; (12) Becky Darnell ran to the door and opened it, but looked up to see Appellant staring her in the eye and pointing a gun straight at her; and (13) Appellant pulled the trigger, and Becky Darnell was struck in the neck.

After the shooting, Appellant fled to her sister's home in Stillwater, Oklahoma. When she reached Oklahoma after a trip that took her nearly twice as long as normal because she had to pull her car over and "pass out" on more than one occasion, she called both the Stillwater police and the Elizabethtown police to confess to the

---

5. The record reflects that the battery to the downstairs cordless phone had been removed and was found on Darnell's bed. Darnell testified that he had not removed the battery.

shooting and informed both law enforcement agencies that she had already made flight arrangements to return to Kentucky. While she was on the phone with the Elizabethtown police, the Stillwater police arrived at her sister's home and arrested her.

After Appellant was extradited to Kentucky, the trial court ordered that she be committed to the Kentucky Correctional Psychiatric Center ("KCPC") for psychiatric examination and treatment. Two (2) of the KCPC doctors who examined and treated Appellant testified at her trial. Dr. Candace Walker testified that: (1) Appellant was so depressed and unstable that a longer-than-typical stay at KCPC was required to stabilize her; (2) on the basis of Appellant's patient history, which included recurrent themes of abandonment, she diagnosed Appellant with borderline personality disorder, which usually begins in early childhood and is typically caused by abandonment, abuse, and/or neglect, that rendered Appellant chronically unstable and prone to depression; (3) persons suffering from this disorder can appear normal at some times and psychotic at others; and (4) Appellant's overreac-

tion to Darnell's abandonment of her after her surgery was consistent with her "abandonment sensitive" personality disorder. Dr. Phillip Wayne Johnson testified to his findings that Appellant suffered from major depression, Gulf War Syndrome, and chronic borderline personality disorder. In addition, Dr. Johnson testified that Appellant's disorder, which he characterized as "extreme" and exacerbated by her depression: (1) manifests itself in frantic efforts to avoid real or imagined abandonment, a diminished ability to control intensity of feelings, impulsivity (including suicide attempts), and a pattern of unstable relationships; and (2) affects perception, judgment, inhibitions, and causes bizarre, aggressive behavior "as crazy as you can imagine," including anger and rage when the sufferer perceives that he or she is the victim of wrongdoing or abandonment.

At the conclusion of the evidence, the trial court instructed the jury that, under Counts One and Two, it could find Appellant not guilty, guilty of the indicted offense of Attempted Murder, or guilty of the lesser-included offense of First–Degree Assault.[6] Under Count Three, the

---

**6.** *See Perry v. Commonwealth,* Ky., 839 S.W.2d 268, 271–273 (1992). *Cf. Luttrell v. Commonwealth,* Ky., 554 S.W.2d 75, 78 (1977) (Second–Degree Assault as lesser-included offense to Attempted Murder). We observe, however, that in holding that KRS Chapter 508 Assault offenses can be lesser-included offenses of Attempted Murder, this Court explicitly rejected "a strict statutory 'elements' approach ... that looks to the elements of the main and lesser crimes as set out by the applicable statutes, rather than ... the charge or the evidence." *Perry v. Commonwealth, supra* at 271. But just five years after *Perry,* in *Commonwealth v. Burge,* Ky., 947 S.W.2d 805, 809–11 (1996) this Court re-examined its double jeopardy jurisprudence, which is the alter-ego (or "flip-side") of our lesser-included offense law, and returned to the "same element" analysis found in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct.

180, 76 L.Ed. 306 (1932). We have not had an opportunity since *Burge* to reconsider whether an Assault offense can be a lesser-included offense to Attempted Murder. In other jurisdictions, which have substantially similar penal statutes, courts have applied *Blockburger*'s "same element" analysis and have held that assault offenses are not proper lesser-included offenses in attempted homicide prosecutions. *See State v. Gisege,* 561 N.W.2d 152, 155–156 (Minn.1997); *People v. Maldonado,* 123 A.D.2d 788, 507 N.Y.S.2d 415, 417 (N.Y.App.Div.1986). And, although we have not reached the question as squarely, we would observe that, in *Commonwealth v. Hager,* Ky., 41 S.W.3d 828 (2001), this Court noted the distinction between KRS Chapter 507 Homicide offenses, which require a person's death, and KRS Chapter 508 offenses, which require physical injury, and held that the trial court's jury instructions erroneously

trial court instructed the jury that it could find Appellant not guilty, guilty of First–Degree Burglary, or guilty of First–Degree Criminal Trespass. The jury found Appellant guilty of the indicted offenses and recommended a total sentence of forty (40) years, which the trial court imposed.

### III. ANALYSIS

In her brief, Appellant itemizes nine (9) separate allegations of error. Many of those allegations are rendered moot, however, by our conclusion that the errors in the jury instructions require a new trial.[7] Accordingly, we will first address the jury instruction errors and then address those remaining allegations of error that are likely to be germane to retrial.

### A. JURY INSTRUCTIONS

█ Appellant argues that the trial court's jury instructions were prejudicially erroneous in that they included neither a definition of "voluntary intoxication" nor a lesser-included offense instruction on Attempted First–Degree Manslaughter. We analyze each of these allegations of error in accordance with the well-settled principles that: (1) "it is the duty of the trial judge to prepare and give instructions on the whole law of the case ... [including] instructions applicable to every state of the

case deducible or supported to any extent by the testimony";[8] and (2) although a defendant has "a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions,"[9] the trial court should instruct as to lesser-included offenses " 'only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." ' [10]

### 1. FAILURE TO DEFINE "VOLUNTARY INTOXICATION"

█ At the conclusion of the evidence, the trial court agreed with Appellant's trial counsel that the evidence justified instructions as to voluntary and involuntary intoxication, and Instruction No. 8 explained the legal effect of both:

> A. Even though the Defendant might otherwise be guilty of Criminal Attempt to Commit Murder, First Degree–Assault, First–Degree Burglary or First–Degree Criminal Trespass under Instructions No. 2, 3, 4, 5 you shall not find her guilty under these Instructions if at the time she committed the offenses (if she did), she was so intoxicated that

---

presented Fourth–Degree Assault as a lesser-included offense in a Murder prosecution. *Id.* at 831.

7. Our reversal for a new trial renders moot allegations: # 4 (concerning the trial court's alleged failure to grant appropriate relief after the Commonwealth's disclosure during the trial of statements made by Appellant), which is moot because the parties should have ample time to review the statements and prepare objections thereto prior to retrial; # 7 (venue), which is moot because pretrial publicity issues are time-and-fact-sensitive, and, regardless of whether the venue for her first trial was appropriate, Appellant may litigate appropriate venue upon retrial if she believes

that she cannot now receive a fair trial in Hardin County; # 8 (recusal of trial judge), which has been rendered moot by Judge Roark's retirement; and (# 9) (alleged prosecutorial misconduct during closing argument), which we find moot because we find it unlikely that the prosecuting attorney will repeat these statements upon remand.

8. *Taylor v. Commonwealth,* Ky., 995 S.W.2d 355, 360 (1999).

9. *Id.*

10. *Gabow v. Commonwealth,* Ky., 34 S.W.3d 63, 72 (2000) (quoting *Houston v. Commonwealth,* Ky. 975 S.W.2d 925, 929 (1998)).

she did not form the intention to commit the offenses.

B. Even though you believe from the evidence beyond a reasonable doubt that the Defendant did form the intention to commit the offense of Criminal Attempt to Commit Murder, First–Degree Assault, First–Degree Burglary or First–Degree Criminal Trespass, you shall not find her ~~not~~ [change initialed "HR"] guilty under those instructions if (1) she was so intoxicated that she was deprived of substantial capacity either to appreciate the criminality of her conduct or to conform her conduct to the requirements of law; AND (2) such intoxication was not voluntary on her part ~~as defined in Instruction No. 1~~. [Initialed "HR"]

And Instruction No. 1 defined "Intoxication" as "mean[ing] a disturbance of mental or physical capacities resulting from the introduction of substances into the body."

■ Appellant's allegation of error relates to the "as defined in Instruction No. 1" language that the trial judge struck from the instructions when it was called to his attention that Instruction No. 1 did not contain such a definition. Appellant's trial counsel argued that the instructions did not adequately define the law of intoxication and asked the trial court to rectify the error by adding a definition of "voluntary intoxication" to Instruction No. 1.[11] Appellant argues on appeal that, in failing to define "voluntary intoxication," the trial court's instructions did not adequately explain intoxication.[12] Appellant argues that this error was compounded by the Commonwealth's statement during its closing argument that "when you start taking pills, that's voluntary." We hold that the trial court's failure to define the term "voluntary intoxication" entitles Appellant to a new trial.

Simply stated, the trial court's election to strike the "as defined in Instruction No. 1" language instead of pausing to retool the instructions and including a definition of "voluntary intoxication" deprived the jury of any basis upon which to distinguish between the statutory concepts of voluntary and involuntary intoxication. The Kentucky Penal Code does not contain a separate definition of "involuntary intoxication." Instead, the Code defines

---

11. Appellant's trial counsel presented the trial court with a copy of Justice Cooper's treatise, 1 Cooper, *Kentucky Instructions to Juries (Criminal)* (Anderson Publishing Co. 1999), and requested that the trial court include the sample instruction found at § 3.06:

> *Voluntary Intoxication*—means intoxication caused by substances which the Defendant knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know [, unless he introduces them pursuant to medical advice . . . .]

Accordingly, we find no merit in the Commonwealth's suggestion that Appellant failed to preserve this error for our review. Although we agree that trial counsel's timing could have been better, *i.e.*, he could have more closely examined the instructions and then raised the error before the trial court began reading the instructions to the jury, we disagree with the Commonwealth's position that the error was procedurally defaulted. Appellant's trial counsel "fairly and adequately presented [his client's position] to the trial judge," RCr 9.54(2), at a time when the trial court had the ability to correct the error before submitting the case to the jury for its deliberations.

12. In addition, Appellant argues, without citation to any supporting authority, that each of the trial court's instructions on the indicted and lesser-included offenses "should include specific language on the effect of intoxication, voluntary and involuntary." We have previously rejected this claim, *see Slaven v. Commonwealth*, Ky., 962 S.W.2d 845, 857 (1998), and because Appellant provides us with no warrant for why we should deviate from our prior holding, we find no merit in Appellant's identical claim.

"voluntary intoxication," [13] and the scope of possible forms of involuntary intoxication is illuminated by what is excluded from the "voluntary intoxication" definition:

> [KRS 501.080(2) ] is consistent with prevailing doctrine and has been applied to four types of situations: intoxication resulting from substances taken into the body under coercion or duress; intoxication resulting from a genuine mistake as to the character of the substance causing it; intoxication resulting unexpectedly from prescribed medication; and intoxication resulting from a weakness unknown to the defendant and grossly excessive to the quantity of stimulant taken into the body. *"Voluntary intoxication" is defined in KRS 501.010 in such a way that these types of involuntary intoxication are still sufficient to relieve a defendant of liability if he has the requisite capacity.* [14]

And we agree with Appellant that, without a definition of "voluntary intoxication," the jury could not properly apply Instruction No. 8B, which described the KRS 501.080(2) defense, to the evidence of Appellant's alleged intoxication caused by her prescription medications. Although the instructional error was prejudicial enough standing alone, we note that, in this case, the jury was not merely denied the correct information, but also might have been affirmatively misled by the prosecuting attorney's declaration during his closing argument that "when you start taking pills, that's voluntary."

The Commonwealth argues that this omission was inconsequential and asserts that Instruction 8B should never have been included in the jury's instructions because the evidence at trial did not justify a finding of involuntary intoxication. We disagree with this assertion. "[I]ntoxication caused by substances which the defendant knowingly introduces into [her] body ... pursuant to medical advice" is excluded from the KRS 501.010(4) definition of "voluntary intoxication," and instead represents a form of involuntary intoxication that can implicate the KRS 501.080(2) defense. The evidence at trial demonstrated that Appellant was released from the hospital with prescriptions for three (3) different pain medications—two (2) of which she was to take "as needed for pain"—that, according to expert testimony, were not commonly prescribed in combination on an outpatient basis and could have a synergistic effect that would affect the patient's ability to think normally. And, while taking this medication, Appellant suffered memory lapses, became disoriented, and exhibited aberrant behavior, *i.e.* wearing hospital garments while she ran errands around town and in Louisville. Other witnesses who interacted with Appellant prior to the shooting, including her neighbor who saw her that very morning, described her as groggy, incoherent, overmedicated, and uncoordinated. Although a jury was certainly free to believe that Appellant was capable of conforming her conduct to the law and of forming the intent to kill, we hold that the evidence was sufficient to permit the jury to make the factual findings set forth in Instruction No. 8B. Accordingly, the trial court's failure to define the terms utilized in that instruction in a manner that allowed the jury to evalu-

---

**13.** KRS 501.010(4):

"Voluntary intoxication" means intoxication caused by substances which the defendant knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them pursuant to medical advice or under such duress as would afford a defense to a charge of crime.

**14.** KRS 501.080, Official Commentary (Banks/Baldwin 1974).

ate properly Appellant's involuntary intoxication defense entitles Appellant to a new trial under proper instructions.[15]

## 2. EED/ATTEMPTED FIRST–DEGREE MANSLAUGHTER

 Appellant argued at trial that the jury could reasonably find that, at the time she fired her handgun at the victims, she was acting under an extreme emotional disturbance ("EED"), and Appellant's trial counsel thus: (1) requested that EED be incorporated as an element of the Attempted Murder instructions;[16] and (2) objected to the First–Degree Assault instructions and asked the trial court instead to instruct the jury that it could find Appellant guilty of Attempted First–Degree Manslaughter as a lesser-included offense. The trial court denied both requests, and Appellant argues that the trial court's rulings constitute reversible error. We hold that the trial court committed reversible error by failing to instruct the jury as requested by Appellant.

 KRS 507.030(1) provides that:

A person is guilty of manslaughter in the first degree when:

. . .

(b) With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance as defined in subsection (1)(a) of KRS 507.020.[17]

Thus, "[e]vidence of EED entitles the [Murder] defendant to an instruction on the lesser included offense of first-degree manslaughter"[18] because:

The murder and first-degree manslaughter statutes go hand in hand. Under the murder statute, if one commits the act while not under the influence of EED, he is guilty of murder. Under the manslaughter statute, if he does the same act while under the influence of EED, he is guilty of manslaughter in the first degree. Thus, depending on the finding of the jury with respect to the absence or presence of EED, the same act may justify a conviction of murder or a conviction of manslaughter.[19]

**15.** In the interest of avoiding additional errors upon retrial, we observe that Instruction 8A should also explain to the jury that the defendant's intoxication could negate the "knowingly" mental state required in connection with First–Degree Burglary. *See Rogers v. Commonwealth*, Ky., 86 S.W.3d 29, 46 (2002).

**16.** On appeal, Appellant argues that the absence of EED is an element of Murder and that the Commonwealth has the burden to prove that element beyond a reasonable doubt in all Murder prosecutions regardless of whether the evidence raises an issue as to whether the defendant acted under EED. This Court explicitly rejected an identical argument in *Stopher v. Commonwealth*, Ky., 57 S.W.3d 787, 803 (2001). *See also Spears v. Commonwealth*, Ky., 30 S.W.3d 152, 154 (2000). The cases cited by Appellant in support of her contrary view do not cause us to question our prior holding. In this case, however, the evidence at trial permitted a jury to find that Appellant acted under EED, and once evidence was produced to prove the presence of EED, "its absence bec[ame] an element of the offense." *Coffey v. Messer*, Ky., 945 S.W.2d 944, 946 (1997). Accordingly, we agree with Appellant's contention that the trial court's Attempted Murder instructions erroneously failed to require the Commonwealth to prove an absence of EED beyond a reasonable doubt.

**17.** KRS 507.030(1)(b).

**18.** *Coffey v. Messer, supra* note 16 at 946.

**19.** *Haight v. Commonwealth*, Ky., 938 S.W.2d 243, 248 (1997).

And, similarly, a defendant under the influence of EED who takes a substantial step towards killing a person with the intent to do so commits Attempted First–Degree Manslaughter rather than Attempted Murder.[20]

■ KRS 507.020(1)(a) refers to an "extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be."[21] We further defined the concept of EED in *McClellan v. Commonwealth*:[22]

> Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefore, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as the defendant believed them to be.[23]

And, although "the mere presence of mental illness, standing alone, does not constitute EED,"[24] given the EED inqui-

ry's focus on the individual defendant's standpoint, "the presence of mental illness ... is entirely relevant to a subjective evaluation of the reasonableness of the defendant's response to the provocation."[25]

In *Spears v. Commonwealth*, Ky., 30 S.W.3d 152 (2003)[26] we explained that the mitigating factor of EED has replaced the common law concept of "sudden heat of passion" homicide:

> Extreme emotional disturbance is the successor to the common law concept of "sudden heat of passion." Though the two are similar, they are not identical
>
> . . . .
>
> ... *Gall v. Commonwealth* [Ky., 607 S.W.2d 97, 108–109 (1980), *cert. denied* 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 824 (1981) ], *overruled on other grounds Payne v. Commonwealth*, [Ky., 623 S.W.2d 867 (1981) ] highlighted the two primary distinctions between EED and sudden heat of passion. Quoting from the commentary to KRS 507.030, the Court in Gall stated "[t]he most significant change ... is an abandonment of the common law requirement that the killing occur in 'sudden heat of passion' upon 'adequate provocation.' " Under EED, "mitigation is not restricted to circumstances which would constitute provocation 'in the ordinary meaning of the term.' ... In other words it is possible for *any event, or even words*, to arouse extreme mental or emotional dis-

**20.** *Cf. Perry v. Commonwealth, supra* note 6 at 271 (referencing trial court's Attempted First–Degree Manslaughter instructions); *Prince v. Commonwealth, supra* note 2 at 326 (holding that Attempted First–Degree Manslaughter under KRS 507.030(1)(a) was not a lesser-included offense on the facts presented, but observing that "[s]ince Prince made no claim of extreme emotional disturbance, KRS 507.030(1)(b) is not applicable.")

**21.** KRS 507.020(1)(a).

**22.** Ky., 715 S.W.2d 464 (1986).

**23.** *Id.* at 468–9.

**24.** *Fields v. Commonwealth*, Ky., 44 S.W.3d 355, 359 (2001).

**25.** *Id.*

**26.** *Supra* note 16.

turbance." The second basic difference is that the jury view the requirement subjectively, from the defendant's point of view, rather than objectively.[27]

 This Court's EED jurisprudence has thus required a provocation or "triggering event" that caused the state of EED.[28] The notion of a "triggering event," however may be a bit misleading, because "the concept of 'adequate provocation' is broad enough to include 'the cumulative impact of a series of related events.'"[29] And a jury may find adequate provocation even if the "triggering event" did not immediately precede the defendant's criminal act:

> However, the triggering event need only be "sudden and uninterrupted." No definite time frame between the triggering event and the killing is required, so long as the EED remains uninterrupted. In fact, the onset of EED "may be more gradual than the 'flash point' normally associated with sudden heat of passion." In *Springer*, we said "[t]he fact that the triggering event may have festered for a time in [the defendant's] mind before the explosive event occurred does not preclude a finding that she killed her husband while under the influence of extreme emotional disturbance." It is for a jury to decide whether a triggering event has occurred and whether a defendant acted under the influence of EED.[30]

In *Fields v. Commonwealth*, Ky., 44 S.W.3d 355 (2001)[31] for example, the Court recognized the possibility that a period of EED could last as long as seven (7) months after the "triggering event" when we held that a First–Degree Manslaughter instruction was proper because "there was substantial evidence ... that [Fields's December 1997 or January 1998] discovery of her out-of-wedlock pregnancy triggered an EED that remained uninterrupted until she killed her child [immediately after its birth at the end of July 1998.]"[32]

 Although we agree with the Commonwealth that the facts of this case do not *compel* a finding that Appellant was acting under EED when she shot her victims, the evidence *permitted* a jury to conclude that she did so. We recognize that "[t]here must be some definite, non-speculative evidence to support an EED instruction,"[33] but we believe the trial record in this case sufficiently demonstrates Appellant's entitlement to the instructions she requested. Specifically, in the days leading up to the shooting, Appellant, who suffered from a borderline personality disorder that made her especially sensitive to perceived abandonment and who had twice earlier that year been hospitalized after unsuccessful attempts to take her own life, was confronted with: (1) a crumbling love affair with Darnell; (2) a back surgery; (3) discovering Darnell in bed with his ex-wife instead of caring for her during her recuperation from surgery as he had promised

27. *Id.* at 154–5.

28. *See Springer v. Commonwealth*, Ky., 998 S.W.2d 439, 452 (1999); *Whitaker v. Commonwealth*, Ky., 895 S.W.2d 953 (1995); *Cecil v. Commonwealth*, Ky., 888 S.W.2d 669 (1994).

29. *Fields v. Commonwealth*, *supra* note 24 at 359 (quoting R. Lawson & W. Fortune, *Kentucky Criminal Law* § 8–3(b)(3), at 342 (LEXIS 1998)).

30. *Spears v. Commonwealth, supra* note 16 at 155.

31. *Supra* note 24.

32. *Id.* at 359.

33. *Hudson v. Commonwealth*, Ky., 979 S.W.2d 106, 109 (1998) (citing *Morgan v. Commonwealth*, Ky., 878 S.W.2d 18, 20 (1994)).

(a startling enough provocation of itself, but here, followed immediately by his assault upon her); (4) a day spent wandering around in a hospital gown while in a pain-killer-induced fugue-like state; (5) a suicidal threat that resulted in police intervention; and finally (6) a confrontation inside her lover's home where her lover exclaimed "Go ahead, shoot me ... put me out of my misery." The jury could have found adequate provocation for an EED in: (1) Darnell's abandonment of her during her recuperation; (2) Darnell's assault upon her; (3) Darnell's final "abandonment" of her when he asked her to shoot him in order to take him out of his "misery," or (4) the cumulative effect of this series of events. And, the jury reasonably could have concluded that the state of EED remained uninterrupted through the shooting. Accordingly, we hold that the trial court erred when it denied Appellant's request for a lesser-included offense instruction as to Attempted First–Degree Manslaughter. And, if the evidence is substantially the same upon remand, the trial court should instruct the jury as to Attempted First–Degree Manslaughter.

## B. APPELLANT'S OTHER ALLEGATIONS OF ERROR

### 1. MOTION TO DISMISS INDICTMENT

■■■■ Appellant moved the trial court to dismiss the indictment returned by the Grand Jury because "[d]uring the course of the [Grand Jury] testimony several incorrect statements were made regarding the events which gave rise to this indictment." Appellant asserted that "[a]bsent the misleading testimony, and if the Grand Jury had been fully informed regarding Ms. Holland's actual psychological problems, the Grand Jury may not have returned an Indictment[.]" The trial court denied the motion. On appeal, this argument has become a one-paragraph assertion—without any citation to meaningful supporting authority—that the indictment must be dismissed because the investigating officer in the case committed perjury. We observe that:

> In this jurisdiction, when an indictment is presented to the court in the manner and form prescribed ... it must be taken and considered as having been found and returned in due form of law, and the court has no authority to inquire into the evidence heard by the grand jury to ascertain whether it was such as is required ... to authorize the finding on an indictment.[34]

We hold that the trial court properly declined to revisit the evidence before the Grand Jury. Accordingly, we find no error in the trial court's denial of Appellant's motion to dismiss the indictment, and, upon remand, the Commonwealth may proceed with its prosecution under this indictment.

### 2. DIRECTED VERDICT

■■■■ Appellant argues that the trial court erred when it denied her motion for directed verdict of acquittal as to all counts under the indictment. More specifically, Appellant argues that the evidence at trial was insufficient to permit a jury to conclude beyond a reasonable doubt that she shot Danny and Rebecca Darnell *with the intent to kill them* and that she *knowingly* entered Darnell's apartment *unlawfully and with the intent to commit a crime.* We review Appellant's argument under the

---

**34.** *Sebree v. Commonwealth,* 260 Ky. 526, 86 S.W.2d 282, 284 (1935). *See also* RCr 5.10 ("[N]o indictment shall be quashed or judgment of conviction reversed on the ground that there was not sufficient evidence before the grand jury to support the indictment.").

standard articulated in *Commonwealth v. Benham*: [35]

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserv[e] to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then is the defendant entitled to a directed verdict. [36]

In light of the evidence in this case, which is set forth in detail above in Part II, we do not find that the jury's verdicts required rank speculation as Appellant asserts, and we do not find those verdicts "clearly unreasonable." We thus hold that the trial court properly denied Appellant's motion.

### 3. EXCLUSION OF AIRPLANE TICKET

 Appellant's allegation that the trial court erred when it prohibited her from introducing into evidence an airplane ticket that she had purchased to return to Kentucky from Oklahoma was not preserved for our review because the ticket itself was not made a part of the appellate record. [37] Although we recognize that the failure to preserve this error complicates our ability to address the issue for purposes of remand because "[a]n appellate court simply cannot address admissibility and prejudice issues in a vacuum," [38] we do observe the following: (1) because Appellant is offering the ticket as physical evidence for a non-hearsay purpose, *i.e.*, to prove that she purchased the ticket prior to her arrest in order to return to Kentucky to face the charges, KRE 802 has no bearing on its admissibility except to the extent that a KRE 105 limiting admonition may be requested; (2) we find it unlikely that testimony from an airline ticket agent would be necessary to authenticate an airline ticket because, under KRE 901(b)(1), Appellant herself should be able to satisfy the condition precedent; and (3) although the trial court has the discretion to exclude cumulative evidence, it must first find that the evidence's "probative value is substantially outweighed by ... considerations of ... needless presentation of cumulative evidence." [39]

### 4. AUDIOTAPE OF TELEPHONE CONVERSATION

 During the Commonwealth's cross-examination of Appellant, the trial court allowed the Commonwealth to intro-

---

**35.** Ky., 816 S.W.2d 186 (1991).

**36.** *Id.* at 187. *See also Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3, 4–5 (1983) ("The clearly unreasonable test seems to be a higher standard for granting a directed verdict ... constitut[ing] an appellate standard of review."); *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530, 533 (1977).

**37.** *Garrett v. Commonwealth*, Ky., 48 S.W.3d 6, 16 (2001) (holding that proper preservation of an allegation of error regarding the exclusion of real evidence "requires avowal testimony to authenticate the document object, then a tender of the document or object to the court as an avowal exhibit.").

**38.** *Commonwealth v. Ferrell*, Ky., 17 S.W.3d 520, 525 (2000).

**39.** KRE 403.

duce a portion of an audiotape made of a telephone call between Appellant and one of her former cellmates. The portion of the audiotape played to the jury lasted less than three (3) minutes, and in it Appellant indicated that she found it "hilarious" that she had been placed on suicide watch because "I wouldn't be telling anybody if I felt suicidal if I was planning to do it. I would just do it and not let anybody know." She also referred to her first suicide attempt and said:

> [T]he night that I tried to kill myself and called Danny, I did what the damn doctor, what Danny told me to do—reach out and call—talk to someone if you're feeling you're trying to kill yourself. So I reached out and called him. But what did he do? Click. But actually he saved my life because he pissed me off. And Melissa doesn't want to leave this world pissed off.... I became angry at him .... I didn't want to hurt him, but I didn't want to hurt myself. I got mad at him personally. It changed my thought processes.

Appellant alleged that the tape had been edited or fabricated [40] and also objected to its introduction on the grounds that the portion of it played for the jury was misleading, consistent with her trial testimony (and thus not admissible under KRE 801–A(1)(a)), and unduly prejudicial because Appellant used profanity. Appellant also requested an admonition that the portion played for the jury was only a small por-

tion of a number of tapes that had been given to the Commonwealth in the middle of the trial by someone who harbored unrequited romantic feelings for Appellant and who had been secretly taping her phone calls with Appellant for over a year.[41]

On appeal, Appellant argues that the introduction of this evidence deprived her of her right to a fair trial. The section of Appellant's brief devoted to this allegation of error, however, contains a series of arguments that we find under-developed and difficult-to-follow. In fact, with the exception of an argument regarding hearsay and an allegation of undue prejudice, we cannot discern the specific warrants for Appellant's broad claim on appeal that the introduction of this tape violated her due process rights. Because we are remanding this case for retrial, we will address the two arguments we can identify, although we recognize that Appellant may raise additional objections upon retrial.

In any event, from the identifiable arguments before us, we find no abuse of discretion in the introduction of this evidence. Although Appellant argues that the audiotaped conversation could not be admitted as a prior inconsistent statement under KRE 801–A(1)(a), we observe that KRE 801–A(2), which permits the introduction of statements by a party opponent, adequately answers any hearsay objection to this evidence. Nor do we perceive any abuse of discretion in the trial court's con-

---

**40.** On the stand, however, Appellant authenticated that the voice on the tape was hers and testified that she had made the statements contained therein.

**41.** Appellant also raises a separate allegation of error, which we have found moot for purposes of this appeal, see supra note 7, as to the trial court's failure to grant appropriate relief in light of this mid-trial development. From our review of the record, however, it does not appear that the trial court prevented Appellant from calling as a witness the person who

produced these tapes for the Commonwealth. The trial court did properly deny Appellant's request for what counsel refers to on appeal as an "in chambers avowal," (but what actually appears to have been a request to depose the witness). And, because many of Appellant's objections to this evidence appear to question the weight that the jury should assign to it rather than its admissibility, we observe that Appellant can raise those issues before the jury by introducing evidence to support the allegations she makes on appeal.

clusion that this evidence's probativeness was not substantially outweighed by any of the KRE 403 considerations that Appellant identifies. Thus, upon remand, unless Appellant raises some additional, meritorious objection to its admissibility, the trial court should allow the Commonwealth to introduce this evidence.

## IV. CONCLUSION

For the above reasons, we reverse the judgment of the Hardin Circuit Court and remand the indictment for a new trial.

LAMBERT, C.J.; COOPER, GRAVES, JOHNSTONE and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion.

WINTERSHEIMER, Justice, Dissenting.

I respectfully dissent from the majority opinion because the circuit judge did not abuse his discretion in refusing to give an instruction on extreme emotional disturbance.

KRS 507.020(1)(a) provides that the defense of extreme emotional disturbance be a reasonable explanation or excuse, the reasonableness of which is to be determined from the defendant's point of view under the circumstances as the defendant believed them to be. I do not believe that the defendant has provided any reasonable explanation or excuse for her behavior. For extreme emotional disturbance to apply, the actor must be acting "uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464 (1986). *See also Hudson v. Commonwealth*, Ky., 979 S.W.2d 106 (1998). In this case, the pronouncements of *Fields v. Commonwealth*, Ky., 44 S.W.3d 355 (2001), *Spears v. Commonwealth*, Ky., 30 S.W.3d 152 (2000) and *Springer v. Commonwealth*, Ky., 998 S.W.2d 439 (1999), do not apply.

Evidence of hurt or anger is insufficient to prove extreme emotional distress. *Talbott v. Commonwealth*, Ky., 968 S.W.2d 76 (1998). The events in the defendant's life prior to the day of the shooting cannot constitute any part of the alleged triggering events. The fact that she picked up a new weapon from a firearms dealer several days before the shooting erodes her defense of EED. The events prior to Saturday, June 22, 1996, do not support the giving of an EED instruction because those events were interrupted by the events of the Saturday in question. The evidence before the trial judge supported the denial of an EED instruction.

In addition, the instructions in regard to involuntary intoxication are sufficient and reversal is not required.

I would affirm the convictions in all respects.